## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

_____

MARCUS SEYMOUR,

      Plaintiff,

v.                                                                                  Case No. 04-2261-BBD-tmp

UNITED STATES POSTAL SERVICE
and JOHN E. POTTER,

      Defendants.

_____

### MEMORANDUM OPINION AND ORDER
_____

      This matter came before the Court for a non-jury trial, which was held May 18-20 and 22, 2009.   Plaintiff Marcus Seymour ("Plaintiff") brings claims of retaliation under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq. ("Rehabilitation Act") and Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e et seq. ("Title VII") and claims that Defendant United States Postal Service ("USPS") and Defendant Postmaster General John E. Potter ("Postmaster") (collectively, "Defendants") interfered with Plaintiff's exercise of his rights under the Family Medical Leave Act of 1993, 29 U.S.C. §§ 2601 et seq. ("FMLA") and retaliated against him in violation of the FMLA.  After reviewing the evidence and the parties' proposed findings of fact and conclusions of law, hearing the testimony of the witnesses called by each party, weighing the credibility of those witnesses, and considering applicable case law and Rules, the Court makes the following findings of fact and conclusions of law.

## I.  FINDINGS OF FACT

      Plaintiff began his employment with the USPS in 1994 at the Memphis Processing and Distribution Center ("P&DC").  (Tr. 59-60.)  On July 3, 2003, Plaintiff submitted FMLA medical

certification to his employer so that he could take care of his wife, Sandra Boyland, following the birth of their son.  (Ex. 4.)  Plaintiff indicated on the completed form that his wife would need care for six to eight weeks after giving birth.  (Id.; Tr. 300-301.)  On that same day, Plaintiff's wife, also a USPS employee, also submitted an FMLA medical certification to the USPS.  (Ex. 5; Tr. 71.) Defendant approved Plaintiff's and his wife's medical certification.   (Tr. 76, 273; Ex. 8.) Specifically, Plaintiff's FMLA leave was pre-approved for a block of time from July 3, 2003 through September 21, 2003.  (Ex. 8; Tr. 300-01.)

On July 9, 2003, while working at the P&DC, Plaintiff confronted Elvin Tate, a subordinate mail handler, about his absence from his work area, which resulted in a heated exchange between the two men.  (Tr. 77-80.)  Plaintiff alleged that Mr. Tate threatened to kill him during this exchange. The Memphis Police Department responded and escorted Mr. Tate off USPS property.[1]  (Tr. 79-81.) The next day, USPS personnel, Ralph Morgan, Phil Murphy, Ken Kloc, and Ethel King, met with Plaintiff to discuss the incident and the possibility of reassigning Plaintiff to another work location. (Tr. 81-82.)   Also on July 10th, Plaintiff submitted a traumatic injury claim for workers compensation, alleging that he experienced significant stress as a result of the encounter with Mr. Tate.  (Tr. 82; Pretrial Order, Stipulated Fact No. 12.)  The following day, on July 11, 2003, Plaintiff called the Attendance Control Office to report his absence.   (Tr. 85; Ex. 17.)   Plaintiff called Attendance Control to report other absences on July 15, 2003, July 21, 2003, and August 21, 2003. (Tr. 83-84.)

At trial, Plaintiff testified to his conversation with Attendance Control on July 15, 2003 and the Court credits that testimony, finding Plaintiff credible and finding sufficient evidence in the

---

[1] Mr. Tate was taken to the Veterans Administration Hospital for observation.  (Tr. 81.)  The USPS did not terminate Mr. Tate's employment, instead requiring him to take a psychological fitness for duty examination before he was allowed to return to work at the P&DC.  (Pretrial Order, Stipulated Fact No. 8.)

record to corroborate his testimony.[2]  (See, e.g., Tr. 382.)  Plaintiff testified that on July 15, 2003, he

called into Attendance Control to report that his wife was being admitted to the hospital to deliver

their baby and that both of them would be using FMLA leave.  (Tr. 83.)  On August 18, 2003, Labor

Relations sent Plaintiff a Notice of Investigative Interview, which was to take place on August 20,

2003 with Plaintiff's supervisor, Phil Murphy, who had requested that the notice be issued to discuss

Plaintiff's absence from duty.  (Ex. 6; Tr. 405.)  For reasons which the parties dispute, Plaintiff did

not appear for the August 20, 2003 investigative interview.  (Tr. 85-88; 408-409.)

In August 2003, while on FMLA leave, Plaintiff received approximately one week's pay,

to which he was not entitled.  (Tr. 88-89; Ex. 51.)  Mr. Murphy was responsible for this pay entry

which resulted in overpayment.  (Tr. 591-92.)  The Court finds that Mr. Murphy knew that

Plaintiff was not working on the dates for which this pay was entered.  Mr. Murphy testified that

he did not see Plaintiff at work until November.  (Id.)  Further, Plaintiff was paid for August 24-

28 when Plaintiff had failed to attend his investigative interview scheduled for August 20 with

Mr. Murphy just four days prior to these pay entries.  Defendants offered no explanation for

generating Plaintiff's extra pay.  Later, the Labor Department of the USPS commenced debt

collection proceedings against Plaintiff due to his acceptance of the overpayment.  (Tr. 591-92,

745; Ex. 16.)   Plaintiff appealed this debt assessment, and, on October 11, 2005, an

administrative law judge entered an order stating that the USPS could not collect on its alleged

debt.  (Ex. 16.)  Plaintiff testified that Andrew Cuccia, who was the maintenance manager at the

BMC, continued attempting to collect money from him on a daily basis well after the date of this

decision and that, as a result, the administrative law judge issued cease and desist orders directed

towards Mr. Cuccia in December 2005 and January 2006.  (Tr. 175-78, 680.)

---

[2] The Court notes that Plaintiff was familiar with the procedure for taking FMLA leave, having used FMLA leave at least twice previously while employed at the USPS and notes that, as a manager, Plaintiff was trained in FMLA procedures.  (Tr. 70-72.)

On September 22, 2003, Mr. Murphy sent Plaintiff a Notice of Proposed Removal from employment, charging Plaintiff with failure to meet the attendance requirements of his position.  (Ex. 7; Tr. 409-410.)  On October 27, 2003, Plaintiff challenged the proposed notice of removal through mediation.  (Ex. 10; Tr. 95-96.)  No agreement was reached at the mediation, and the mediator issued a No Agreement Letter, which listed Mr. Murphy as the deciding official to whom a final appeal should be addressed.   (Ex. 10.)   On that same day, October 27th, Plaintiff met with Ruby Bridgeforth, the plant manager, to discuss his removal.  (Tr. 102, 599.)  During this meeting, Ms. Bridgeforth requested more information from Plaintiff explaining the reasons for his absences from work.  (Tr. 120-22; 599-600.)   On October 30, 2003, Plaintiff mailed Ms. Bridgeforth a letter regarding his absences, which included no mention of the birth of his son or his FMLA leave.  (Ex. 19.)   Also on October 30th, Plaintiff mailed Ms. Bridgeforth a statement from his doctor, which advised that he was incapacitated from work from July 10, 2003 to November 12, 2003.  (Pretrial Order, Stipulated Fact No. 17.)  Plaintiff underwent a fitness for duty evaluation on November 13, 2003, and the evaluating physician cleared Plaintiff to return to work on November 14, 2003.  (Ex. 11; Pretrial Order, Stipulated Fact No. 19.)  The Notice of Proposed Removal was not removed from Plaintiff's personnel file.  (Tr. 169-171.)  On that same date, November 13th, Plaintiff filed a formal complaint of discrimination with the Equal Employment Opportunity Commission ("EEOC"),[3] alleging discrimination based on race and disability when Mr. Murphy (1) scheduled him for the investigative interview on August 20 and (2) issued Plaintiff a Notice of Proposed Removal. (Ex. 18; Pretrial Order, Stipulated Fact No. 21.)

On November 17, 2003, upon reporting to the P&DC to receive his assignment as instructed, Plaintiff experienced an anxiety attack due to being in the same building as Mr. Tate.  (Ex. 12; Tr.

---

[3] Plaintiff initiated pre-complaint EEOC counseling on September 22, 2003 (hereinafter, "informal complaint"). (Ex. 18.)  Mr. Murphy testified that he was sure that he was contacted by an EEOC representative once Plaintiff filed his informal complaint but that he could not recall what form that contact took.  (Tr. 554.)

126-28.)  Plaintiff informed Ms. Bridgeforth and Mr. Kloc that he was upset by being required to work in the same facility as Mr. Tate.  Plaintiff was then temporarily assigned to the USPS's Memphis Bulk Mail Center ("BMC"), to which he remained assigned until June 11, 2004.  (Tr. 127-28; Pretrial Order, Stipulated Fact No. 22.)

Beginning June 11, 2004, Plaintiff was assigned to Tour 1, the overnight shift, at the P&DC but he did not attend work June 11-14.[4]  (Pretrial Order, Stipulated Fact No. 23; Tr. 45, 135.)  On Monday, June 14th, Plaintiff attempted to report these absences to Attendance Control.  Plaintiff could not get through to that office so he called the plant manager's secretary, who told him that she would let the plant manager know of Plaintiff's absences.  (Tr. 135-136, 229-30.)  On June 15, 2004, while Plaintiff was en route to a meeting with the plant manager, Nathan Logeson, to discuss his assignment at the P&DC, Plaintiff encountered Mr. Murphy, who asked to see Plaintiff for an investigative interview due to Plaintiff's recent absences.  (Tr. 136-137.)  Plaintiff told Mr. Murphy that he was under doctor's orders not to report to work.  (Tr. 137.)  For reasons which the parties dispute, Mr. Murphy did not continue to seek the investigative interview.  (Tr. 139-40, 429-430.)

On June 18, 2004, Plaintiff was assigned to the USPS's Front Street Office and was directed to return to the P&DC on July 20, 2004.  (Pretrial Order, Stipulated Fact No. 24; Tr. 141.)  While at this 30-day assignment, Plaintiff's pay was entered by an incorrect means.  (Tr. 141-42; Ex. 50-51.)  As a management-level employee, his pay was supposed to be entered automatically into the pay system, rather than manually.  (Id.)  Although Plaintiff did not lose any pay as a result of the manual pay entries, Plaintiff was anxious that the amount of his pay would be affected.  (Tr. 142.)  Plaintiff asked Mr. Murphy, who had the ability to change the method by which his pay was entered, to correct the situation but he did not.  (Tr. 141-42.)  Plaintiff's pay was entered manually from June 21 to July 16.  (Ex. 50-51; Tr. 588-591.)  Following his detail to the Front Street office, Plaintiff returned to the P&DC on Tour 1 for about two weeks and was then temporarily assigned again to the

---

[4] On June 11, 2004, Plaintiff took a day of observance due to the death of former President Reagan.  (Tr. 135.)

BMC.  (Pretrial Order, Stipulated Fact No. 25; Tr. 143-46.)  On September 16, 2004, Plaintiff filed a second formal complaint, alleging that Mr. Murphy and Mr. Kloc retaliated against him by taking the following actions: (1) seeking the June 2004 attempted investigative interview, (2) counting his June 12th, 13th, and 16th absences as absent without leave, (3) paying Plaintiff incorrectly for an extra day while working at the Front Street station, and (4) denying Plaintiff's request to be assigned to the P&DC and reassigning him to the BMC.  (Ex. 20; Pretrial Order, Stipulated Fact No. 26.)

While assigned to the BMC in the fall of 2004, an issue developed regarding Plaintiff's ability to climb into "the steels."[5]  On September 28, 2004, Plaintiff's then supervisor, Rufus Williams, told Plaintiff that he would be learning "react" duties, which involve responding quickly to and analyzing machinery breakdowns and malfunctions in the steels and on the floor.  (Ex. 52; Pretrial Order, Stipulated Fact No. 27 and 28.)  Mr. Williams testified that Plaintiff responded that he could not go into the steels because he had a medical condition that prevented him from climbing ladders.  Upon hearing this, Mr. Williams asked Plaintiff for medical documentation.  (Tr. 634-35, 660; Ex. 52.)  Albert Rhinehart, who was then a supervisor of maintenance operations, also testified that he was present during this exchange and that Plaintiff stated that he could not climb ladders because of his knees.  (Tr. 659-60.)  Mr. Williams testified that about one month later, Plaintiff again indicated to him that he could not go up into the steels.  (Tr. 636; Ex. 52.)  The Court credits Mr. Williams' testimony that he did not immediately request a fitness for duty examination because he wanted to give Plaintiff ample time to submit his medical documentation.  (Tr. 655.)  Mr. Cuccia, to whom Mr. Williams reported, also became involved in the situation and requested medical documentation, to which Plaintiff responded that Human Resources already had the information on his disability rating.  (Tr. 686; Pretrial Order, Stipulated Fact No. 29.)  In an October 25, 2004 letter to Plaintiff, Mr. Cuccia again requested medical documentation of Plaintiff's disability.  (Ex. 54; Tr.

---

[5] Many of the machines at the BMC are located above the floor and are accessed by ladders and catwalks.  The area in which these machines are located is referred to as "the steels."  (Pretrial Order, Stipulated Fact No. 28.)

686-87.)  When Plaintiff did not submit additional medical documentation, Mr. Cuccia informed Plaintiff that he would have to request a fitness for duty examination.  Plaintiff then advised Mr. Cuccia that he never said that he could not climb ladders.  (Tr. 691; Pretrial Order, Stipulated Fact No. 31.)  James Kleber replaced Mr. Williams as Plaintiff's supervisor when Mr. Williams' detail ended, and Mr. Kleber initiated a fitness for duty request in December of 2004 at Mr. Cuccia's direction.  (Tr. 693, 717-18.)  Meanwhile, Plaintiff's job duties that required him to be in the steels were given to another supervisor, and on January 5, 2005, with Mr. Cuccia's approval, Mr. Kleber reassigned Plaintiff to Tour 3.[6]  (Pretrial Order, Stipulated Fact No. 30 and 38; Tr. 152.)  Plaintiff submitted to a fitness for duty examination in March of 2005, which cleared Plaintiff for work.  (Tr. 148, 692; Pretrial Order, Stipulated Facts No. 33 and 34; Ex. 65.)  Mr. Cuccia acknowledged at trial that if Plaintiff had failed the fitness for duty exam, Plaintiff would have been demoted to supervisor of custodians, a position which did not exist.  (Tr. 744.)  Plaintiff flatly denies that he ever told anyone that he had a problem with his knees which kept him from going into the steels.  (Tr. 148-49.)

On December 20, 2004, Plaintiff filed a third formal complaint, alleging disability discrimination and retaliation based on the following actions of Mr. Cuccia: (1) delaying the signing and forwarding of Plaintiff's traumatic injury claim for workers compensation filed on October 25, 2005 and (2) directing Plaintiff to provide copies of his medical records and informing Plaintiff that he was permanently reassigned to supervisor of custodians and demoted.  (Ex. 21; Pretrial Order, Stipulated Fact No. 37.)  On February 19, 2006, Plaintiff filed a fourth formal complaint, alleging retaliation based on the following actions of Mr. Cuccia: (1) reassigning Plaintiff to Tour 3 and (2) scheduling Plaintiff for a fitness for duty examination on March 5, 2005.  (Ex. 23; Pretrial Order, Stipulated Fact No. 39.)  On April 14, 2005, Plaintiff filed a fifth formal complaint, alleging retaliation based on the following alleged actions: (1) falsifying statements, (2) violating the Privacy

---

[6] Tour 3 employees reported to work from approximately 2:45 p.m. to 11:45 p.m.  (Ex. 62.)

Act and EL 603, and (3) scheduling Plaintiff for a fitness for duty examination on February 15, 2005. (Tr. 152-53; Pretrial Order, Stipulated Fact No. 40; Pretrial Order, Stipulated Fact No. 40.)

Plaintiff filed a complaint in the United States District Court for the Western District of Tennessee against Defendants on April 13, 2004, which complaint was amended on March 14, 2005, making claims under Title VII, the Rehabilitation Act, the FMLA, the Privacy Act of 1974, 5 U.S.C. §§ 552a et seq. ("Privacy Act"), the Tennessee Human Rights Act, Tenn. Code Ann. §§ 4-21-101 et seq. ("THRA"), and tort law. On September 13, 2007, the Court granted summary judgment in favor of Defendants on Plaintiff's Title VII hostile work environment claim and his disability discrimination claim under the Rehabilitation Act. The Court also dismissed all Privacy Act, THRA, tort, and punitive damages claims. The Court denied summary judgment in favor of Plaintiff on his Title VII and Rehabilitation Act retaliation claims and on his FMLA claims.

## II. CONCLUSIONS OF LAW

### A. Family Medical Leave Act

#### 1. General Legal Standard

The FMLA entitles qualifying employees to as many as twelve weeks of unpaid leave for the birth of a child, the adoption or foster care placement of a child, to care for a family member with a serious health condition, or for the employee's own serious health condition. 29 U.S.C. § 2612(a). There are two theories of recovery under the FMLA: the entitlement or interference theory, id. § 2615(a)(1), and the retaliation or discrimination theory, id. § 2614(a)(1). Under the entitlement or interference theory, it is unlawful for an employer "to interfere with, restrain, or deny the exercise" of an employee's FMLA rights. Id. Under the retaliation or discrimination theory, any employee who takes or returns from leave shall be restored to his or her former position or to an equivalent position. Id. § 2614(a)(1). Plaintiff contends that Defendants both

interfered with his FMLA rights when they did not designate his absences from mid-July to mid-to-late-September 2003 as FMLA-protected absences and retaliated against him for exercising his FMLA rights.

### 2.  Interference

To prevail on an entitlement or interference claim, a plaintiff must establish that: (1) that he or she is an eligible employee under the FMLA, (2) the defendant is an employer subject to the FMLA, (3) the employee was entitled to leave under the FMLA, (4) the employee gave the employer notice of his or her intention to take leave, and (5) the employer denied the employee FMLA benefits to which he or she was entitled.  Cavin v. Honda of Am. Mfg., Inc., 346 F.3d 713, 719 (6th Cir. 2003).  The parties do not dispute that Plaintiff was a qualified employee, that the USPS was an employer subject to the FMLA, and that Plaintiff was entitled to leave.  The parties dispute, however, whether Plaintiff gave adequate notice of his intention to take leave and whether Defendants denied him FMLA benefits to which he was entitled.

"[T]o invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for leave."  Brohm v. JH Props., Inc., 149 F.3d 517, 523 (6th Cir. 1998).  In determining whether notice was given, "[w]hile the employee need not actually mention the FMLA by name, 'the critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off . . . .'" Id. (citation omitted).  When the need for leave is foreseeable, an employee shall provide his or her employer notice as set forth by 29 U.S.C. § 2612(e).  "When the approximate timing of the need for leave is not foreseeable, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case."  29 C.F.R. § 825.303(a).

The Court finds from the evidence in the record that Plaintiff reasonably apprised Defendants of his intent to take FMLA leave when he submitted his FMLA medical certification for himself to take care of his pregnant wife, which certification was approved.  Further there is sufficient evidence to conclude that he notified Defendants on July 15, 2003 that he intended to begin his pre-approved FMLA leave.   Plaintiff's medical certification stated that he was requesting FMLA leave to care for his wife after the birth of their child and that he expected his FMLA leave to begin on July 26, 2003, his wife's due date.  Plaintiff could not foresee the timing of his need for leave and provided notice to Defendants as soon as practicable—on July 15th, the day his wife went into labor.   Plaintiff therefore provided sufficient notice to Defendants of his intent to begin his pre-approved FMLA leave.

Plaintiff claims that Defendants interfered with his FMLA rights by sending him the Notice of Proposed Removal and by giving Plaintiff a zero percent merit pay increase in 2003. "[E]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions."  29 C.F.R § 825.220(c); see Cavin, 346 F.3d at 726-27 (citing and applying same).  The Court finds that Mr. Murphy sent Plaintiff the Notice of Proposed Removal for failure to meet the attendance requirements of Plaintiff's position, based in part on FMLA-protected absences.  (Ex. 7.)  Thus, the Court finds that the Proposed Notice of Proposed Removal interfered with Plaintiff's lawful exercise of his FMLA rights.  By that same reasoning, the Court finds that Defendants interfered with Plaintiff's FMLA rights by giving him a zero percent pay increase in 2003 due to the proposed removal, which was based on Plaintiff's FMLA-protected absences.  (Tr. 160-61,736, 787.)

**a.  Damages for Interference with FMLA Rights**

**i.  Wages, Salary, Employment Benefits, or Other Compensation**

Any employer who violates 29 U.S.C. § 2615 shall be liable to any eligible employee affected for damages equal to "any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation" and interest thereon.  29 U.S.C. § 2617(a)(1)(A)(i)-(ii).  Plaintiff testified at trial that he lost $32,400 in time that he would have accrued and money that he should have been paid in 2003 as a result of Defendants' interference.  (Tr. 166-67.)  Specifically, this amount is based on the 125 days that Plaintiff was listed as on "leave without pay" status from July 10, 2003 to November 17, 2003.  (Id.)

Defendants argue that Plaintiff is entitled to no damages because when he called in for FMLA leave, Plaintiff requested leave without pay.  The FMLA "does not require an employer to pay a certain pay rate while the employee is on leave; the FMLA only requires that an employer permit an employee to take up to twelve weeks of unpaid leave for illness and return to his prior post or an equivalent position."  Hendricks v. Compass Groups, USA, Inc., 496 F.3d 803, 806 (7th Cir. 2007).  FMLA regulations state that "[g]enerally, FMLA leave is unpaid leave.  However, under . . . [certain circumstances] . . . [the] FMLA permits an eligible employee to choose to substitute accrued paid leave for FMLA leave."  29 C.F.R. § 825.207(a).  "If neither the employee nor the employer elects to substitute paid leave for unpaid FMLA leave . . . , the employee will remain entitled to all the paid leave which is earned or accrued under the terms of the employer's plan."  Id. at (b).  The Court finds that Plaintiff requested leave without pay for his FMLA leave.  (Ex. 28-31, 38.)  Plaintiff, however, did not take twelve weeks of FMLA leave.  Plaintiff testified that he called in to return to work around September 11, 2003.  (Tr. 91.)  Therefore, Plaintiff would have taken approximately eight weeks of unpaid FMLA leave and is

not entitled to back pay for that time.  Thus, the Court awards Plainitff $32,400 but reduces Plaintiff's back pay request by eight weeks' pay, with interest thereon calculated at the prevailing rate.[7]

Plaintiff also testified to the loss that he sustained when Defendants did not award him a merit pay increase in 2003.  (Tr. 160-61.)  The Court finds that Plaintiff has proven this claim by a preponderance of the evidence.  However, the record does not contain sufficient data for the Court to make the calculation.  Defendant is ordered to calculate the merit increase and submit that amount to the Court for inclusion in the final judgment within fifteen (15) days of this order. Plaintiff shall have fifteen (15) days following the filing to respond.

### ii.  Liquidated Damages

Under the FMLA, a plaintiff is also entitled to recover liquidated damages equal to the sum of his damages, unless the employer proves to the satisfaction of the court that the act or omission which violated 29 U.S.C. § 2615 "was in good faith *and* that the employer had reasonable grounds for believing that the act or omission was not a violation."  Id. at (a)(1)(i) (emphasis added).  To establish reasonable grounds, an employer must demonstrate that it took affirmative steps to comply with the FMLA.  See e.g., Hoffman v. Prof'l Med Team, 394 F.3d 414, 419-420 (6th Cir. 2005).  "Good faith requires some duty [on the part of the employer] to investigate potential liability under the [FMLA]."  Miller v. G.B. Sales & Serv., No. 02-70758, 2003 U.S. Dist. LEXIS 19450, at *11-12 (E.D. Mich. Sept. 29, 2003) (quoting Morris v. VCW, Inc., No. 95-0737-CV-W-3-6, 1996 U.S. Dist. LEXIS 19201, at *9 (W.D. Mo. Dec. 26, 1996)). The Court finds that Defendants did not have reasonable grounds for believing that they were not interfering with Plaintiff's FMLA rights.  Plaintiff's FMLA Data Report shows that Plaintiff had

---

[7] Plaintiff is entitled to the value of the leave accrued during the 125 days that Plaintiff was listed as being on leave without pay.

approved FMLA leave from July 3, 2003 through September 21, 2003.  (Ex. 8.)  Any manager at Plaintiff's pay location could view Plaintiff's FMLA Data Report.  (Tr. 303.)  Further, when Ralph Morgan, Ken Kloc, Ethel King and Phil Murphy all met with Plaintiff on July 10, 2003 following the incident with Mr. Tate, Plaintiff's upcoming FMLA leave was discussed.  (Tr. 87, 447; Ex. 38.)  After the meeting, Mr. Kloc sent out an email to the BMC plant manager, Kenneth Gourdine, copying Ruby Bridgeforth and all parties present at the meeting, asking Mr. Gourdine if Plaintiff could work at that location until "he takes some time off" because Plaintiff "will be taking LWOP/FMLA" as his wife is "due to have a baby very soon."  (Ex. 38.)  Such knowledge should have triggered an inquiry on the part of Defendants to confirm whether Plaintiff requested FMLA leave when confronted with any inconsistencies.  (See e.g. Ex. 27 and Ex. 30 compared with Ex. 28, 29, and 31.)  Finally, Plaintiff's wife had no problems using her FMLA leave after Plaintiff's July 15, 2003 call-in.  (Tr. 307.)  The Court finds that Defendants unreasonably relied on an erroneous interpretation of the facts and did not take steps to ensure FMLA compliance. Further, Defendants have proffered insufficient evidence to show that they consulted with agency regulations or administrative or judicial interpretations or with an attorney before making the decision to propose Plaintiff's termination.  Therefore, the Court finds that Defendants have failed to prove that they acted in good faith or that they had reasonable grounds for believing that they were not in violation of the FMLA and awards Plaintiff liquidated damages.

### 3.  Retaliation

Courts apply the McDonnell Douglas burden-shifting test to FMLA retaliation claims.  In order to demonstrate a prima facie case of retaliation under the FMLA, a plaintiff must demonstrate that: (1) he or she availed him or herself of a protected right under the FMLA by notifying his or her employer of his or her intent to exercise FMLA-protected leave; (2) he or she

was adversely affected by an employment decision; and (3) evidence of a causal connection between the exercise of FMLA rights and the adverse employment action exists.  <u>Skrjanc v. Great Lakes Power Serv. Co.</u>, 272 F.3d 309, 313-14 (6th Cir. 2001).  After the plaintiff produces evidence sufficient to establish the prima facie case, the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason . . . " for the adverse action.  <u>Id.</u> at 315.  If the defendant articulates such a reason, then the plaintiff has the burden of showing that the articulated reason is pretextual.  <u>Id.</u>  The Court will address FMLA retaliation along with Plaintiff's Title VII and Rehabilitation Act retaliation claims below as the evidence Plaintiff uses to support his other retaliation claims overlaps with that used to support his FMLA retaliation claims, and all of Plaintiff's retaliation claims are analyzed under the same standard.

### B.  Retaliation

#### 1.  Legal Standard

Title VII's anti-retaliation provision prohibits an employer from discriminating against an employee because he or she opposed a practice made unlawful by Title VII or filed a charge, testified, assisted, or participated in a Title VII proceeding or investigation.  42 U.S.C. § 2000e-3(a).  "The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  <u>Burlington N. & Santa Fe Ry. v. White</u>, 126 S. Ct. 2406, 2414 (2006).  Thus, the plaintiff must demonstrate "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  <u>Id.</u> at 2415 (internal quotation marks and citations omitted).  The significance of an act of retaliation will depend on the surrounding circumstances.  <u>Id.</u>

In order to set forth a prima facie case for retaliation, a plaintiff must demonstrate that: 1) he or she engaged in an activity protected by Title VII; 2) the defendant knew the plaintiff engaged in protected activity; 3) the defendant took an action adverse to the plaintiff; and 4) there was a causal connection between the protected activity and the adverse employment action. Wrenn v. Gould, 808 F.2d 493, 500 (6th Cir. 1987).  In order to establish a causal connection between a plaintiff's protected activity and the challenged action, the plaintiff must "proffer evidence sufficient to raise the inference that [his or] her protected activity was the likely reason for the adverse action." EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997) (citation omitted).

If the plaintiff presents sufficient evidence to establish a prima facie case, the burden shifts to the defendant to present legitimate, non-discriminatory reasons for its actions. Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 563 (6th Cir. 2004).  The defendant "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 257 (1981).  If the defendant satisfies its burden, the burden shifts back to the plaintiff to demonstrate that the defendant's reasons are pretextual. Id.  "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000).

Once a case has proceeded to trial, a court should not focus on the elements of a prima facie case, but instead, the court should focus on the ultimate question of retaliation. See EEOC v. Avery Dennison Corp., 104 F.3d 858, 863 (6th Cir. 1997).  Plaintiff argues, and the Court agrees, that this standard does not render the elements of a plaintiff's prima facie case

15

meaningless.  Rather, those factors are subsumed into the ultimate question of whether a defendant engaged in unlawful retaliation.[8]

## 2.  Alleged Retaliatory Actions[9]

As a preliminary matter, Defendants argue that Plaintiff failed to exhaust his administrative remedies with respect to several of his retaliation claims because none of Plaintiff's EEOC complaints reference certain alleged retaliatory acts.  "In order for a federal court to have jurisdiction over a Title VII claim, the plaintiff must exhaust administrative remedies by raising the claim in a charge to the EEOC."  Ullman v. Ohio Bureau of Empl. Servs., 201 F.3d 441 (table), 1999 U.S. App. LEXIS 32226, at *11 (6th Cir. Dec. 3, 1999) (citations omitted).  "The filing requirement is waived for claims of retaliation stemming from the filing of the charge [and] filing is required for claims of retaliation based on conduct occurring before the charge was filed."  Id. at *12.  The Court finds that all of Plaintiff's retaliation claims stem from the filing of his informal or formal complaints or from the exercise of his FMLA rights.  Thus, Plaintiff's retaliation claims are not barred by a failure to exhaust administrative remedies.

### a.  Notice of Proposed Removal and Administrative Pay

Plaintiff claims that Mr. Murphy's refusal to rescind the proposed termination and the failure to pay Plaintiff administrative pay while his removal from service was pending were

---

[8] Plaintiff also contends that Defendants retaliated against him for participating in protected activity under the Rehabilitation Act.  The legal standard for retaliation under the Rehabilitation Act is the same as that for Title VII.  See Gribcheck v. Runyon, 245 F.3d 547, 550-52 (6th Cir. 2001).

[9] The Court notes that at the close of Plaintiff's proof, Defendants moved for "directed verdict" on Plaintiff's claims that Mr. Cuccia retaliated against Plaintiff as detailed in the second EEO complaint of September 16, 2004 (Tr. 259-60), which the Court construes as a motion for judgment on partial findings under Fed. R. Civ. P. 52(c).  At trial, the Court declined to render any judgment until the close of evidence.  The Court finds that Mr. Cuccia is not implicated in Plaintiff's second EEO complaint.  (See Ex. 20; Pretrial Order, Stipulated Fact No. 26; Plaintiff's Proposed Findings of Fact and Conclusions of Law 21-22.)  Therefore, the Court strikes as moot Defendants' Rule 52(c) motion.

actions taken in retaliation for Plaintiff's exercise of his FMLA rights and/or his filing of an informal complaint of discrimination on September 22, 2003 and a formal complaint on November 13, 2003.  The Court finds the Defendants knew that Plaintiff engaged in protected activities, that Defendants took an action adverse against Plaintiff, and that Plaintiff has shown evidence of a causal connection.  The Court has found that Mr. Murphy had knowledge of Plaintiff's informal complaint based on Mr. Murphy's testimony that he was sure that he was contacted by the EEOC regarding Plaintiff's informal complaint.  Mr. Murphy issued the notice of proposed termination on September 22, 2003, the same day as Plaintiff's informal complaint, but after Plaintiff's FMLA leave began.  Therefore, the Court does not find that Mr. Murphy issued the notice with knowledge of Plaintiff's EEOC activity.  Mediation took place on October 27, 2003, at which time Mr. Murphy did not withdraw the proposed removal.  While Plaintiff's proposed removal never materialized, the notice of proposed removal remains in Plaintiff's personnel file and Plaintiff testified that he has been denied at least one job opportunity due to the notice on file.  (Tr. 169-71.)  Therefore, the Court finds that Defendants' Notice of Proposed Removal was a materially adverse action because the notice was not expunged and Plaintiff's career has suffered as a result.  See, e.g., Butler v. Potter, No. 06-CV-3828 (JFB) (WDW), 2009 U.S. Dist. LEXIS 24868, at *41-42 (E.D.N.Y. March 26, 2009) (holding no adverse action when the proposed notice of termination was expunged and there were no adverse consequences to plaintiff).  Further, the close proximity in time between the filing of the EEOC complaint and the refusal to withdraw the notice of proposed termination before or during the mediation, as well as the close proximity in time between the proposed removal and Plaintiff's FMLA leave, constitutes evidence of causal connection.  See Randolph v. Ohio Dept. of Youth Servs., 453 F.3d 724, 737 (6th Cir. 2006).

Plaintiff attempts to show that Defendants' legitimate, nondiscriminatory reason for proposing Plaintiff's termination—Plaintiff's absences and failure to attend the investigative interview—is pretextual by arguing that Defendants' deviations from their established policies are indicative of retaliatory intent. First, Plaintiff argues that, in violation of USPS policy, Mr. Murphy was listed as the proposing official for the removal and the deciding official to whom a final appeal of the proposed removal should be addressed. Further, Defendants failure to issue a written decision subsequent to the mediation violated USPS policy. The Court does not find that such a conclusion can be drawn from Defendants' actions. The Court finds that during the mediation Sherman Bolden acted as the mediator and that Mr. Murphy attended the mediation as the proposing official. Plaintiff has not put forth sufficient evidence to show that the listing of Mr. Murphy on the No Agreement Letter as the deciding official to whom Plaintiff should appeal was anything more than a clerical error made by the mediator. Plaintiff argues that clerical error does not explain why Mr. Murphy proceeded to serve as the deciding official at the mediation. Although listed as the deciding official to whom Plaintiff could appeal, Plaintiff has not put forth sufficient evidence to show that Mr. Murphy in fact served as the deciding official during or after the mediation. In fact, as the Court has found, Plaintiff appealed to Ruby Bridgeforth to challenge the proposed removal. Mr. Murphy never issued any written decision on the termination. (Tr. 539-40.)

Plaintiff also argues that Defendants' legitimate, nondiscriminatory reason has no basis in fact. The Court has already found Defendants' actions in proposing the notice of termination to be unreasonable and finds that Defendants' unreasonable decision to propose Plaintiff's termination undermines Defendants' proffered legitimate, nondiscriminatory reason. Defendants' failure to make a reasonably informed and considered decision before taking an

adverse employment action is evidence of pretext.  See Risch v. Royal Oak Police Department, 581 F.3d 383, 391 (6th Cir. 2009) (citing White v. Baxter Healthcare Corporation, 533 F.3d 381, 393 n.6 (6th Cir. 2008)) ("[A] plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision 'to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.'")  Based on the foregoing reasons, the Court finds that Plaintiff has carried his burden in establishing that the Notice of Proposed Termination and subsequent failure to withdraw the notice were retaliatory acts taken as a result of Plaintiff's use of FMLA leave.  The Court notes that the fact that Mr. Murphy proposed Plaintiff's termination without knowledge of Plaintiff's EEOC activity makes it unlikely that the failure to withdraw the notice was based on Plaintiff's EEOC activity and more likely than not that the notice was based on Plaintiff's use of FMLA leave.

Plaintiff also argues that Defendants' failure to pay Plaintiff administrative pay while his removal from employment was pending was retaliatory.  (Tr. 94-95; Ex. 32.)  At trial, Defendants stipulated to the fact that "Mr. Murphy took no action for Mr. Seymour to receive administrative leave with pay following the notice of proposed removal." (Tr. 545.)  Pursuant to the USPS Employee Labor and Relations Manual Nonbargaining Disciplinary, Grievance, and Appeal Procedures, Plaintiff was entitled to remain in a pay status from the date he received the notice of proposed termination until at least thirty days thereafter.  (Ex. 32.)  Defendants have offered no explanation for why Plaintiff did not receive his administrative pay.  Thus, the Court finds that Defendants' failure to pay Plaintiff administrative pay while his removal from employment was pending was also a retaliatory act taken as a result of Plaintiff's use of FMLA leave.

### b. Reassignment to P&DC over Plaintiff's Doctor's Orders and June 2004 Investigative Interview

Plaintiff claims that Mr. Murphy retaliated against Plaintiff when Mr. Murphy attempted to have Plaintiff returned to the P&DC over Plaintiff's doctor's orders. Plaintiff was notified in the spring of 2004 that at the end of his 90-day detail at the BMC, he would return to the P&DC. (Tr. 133.) Plaintiff did not testify as to how he received this notice or who sent him the notice. Plaintiff did testify that following receipt of this notice, he spoke to the new plant manager, Nathan Logeson, to explain why he felt unsafe returning to the P&DC. (Tr. 134.) Plaintiff testified that Mr. Murphy communicated to Plaintiff during this time that he expected Plaintiff back at work. (Tr. 135.) Mr. Murphy sent Plaintiff an email on June 4, 2004, informing Plaintiff of his assignment at the P&DC. (Ex. 36.)[10]

Plaintiff has not put forth sufficient evidence for the Court to conclude that Mr. Murphy was the official responsible for Plaintiff's proposed return to the P&DC. Plaintiff did not testify as to who sent him the notice to return to the P&DC nor what form that notice took. Plaintiff also did not submit any documentation evidencing such notice from which the Court could determine the responsible official, nor has Plaintiff submitted any evidence as to who the deciding official would have been under USPS procedures. Plaintiff has put forth insufficient evidence to show that the purpose of Mr. Murphy's June 2004 email was not simply to advise Plaintiff of his work schedule. In the past, the former plant manager, Ruby Bridgeforth, extended Plaintiff's temporary details, at least once on Plaintiff's request. (Tr. 127-30.) Therefore, it is likely that Mr. Logeson, as plant manager, was the official responsible for Plaintiff's proposed return to the P&DC, and there is no evidence in the record to suggest that Mr. Logeson had any knowledge of Plaintiff's EEOC complaint or FMLA leave. "At least one

---

[10] It is unclear from the record whether the notice Plaintiff received in the spring of 2004 is the same as Mr. Murphy's June email.

district court has concluded that knowledge of a plaintiff's protected activity can be inferred from evidence of prior interaction of individuals with such knowledge and those taking the adverse employment action." Muhall v. Ashcroft, 287 F.3d 543, 553 (6th Cir. 2002) (discussing to Krawlowec v. Prince George's County, Maryland, 503 F. Supp. 985 (D. Md. 1980.))  In this case, Plaintiff testified that Mr. Logeson must have received information from Mr. Murphy, Mr. Cuccia, and Mr. Kloc, which would have caused Mr. Logeson to discredit Plaintiff's fear of returning to the P&DC.  (Tr. 134.)  The Court finds that there is insufficient evidence in the record to suggest that Mr. Murphy actively participated in Mr. Logeson's decision to bring Plaintiff back to the P&DC or to suggest that Mr. Murphy made Mr. Logeson aware of Plaintiff's protected activities.  Because Mr. Logeson lacks such knowledge, the Court cannot find that the change in Plaintiff's work location to the P&DC was based on retaliation.  Even assuming that Mr. Murphy were responsible for Plaintiff's assignment to the P&DC, however, Plaintiff has nevertheless failed to prove by a preponderance of the evidence that Plaintiff's change in work location back to the P&DC was anything more than the result of the expiration of his detail to the BMC and the resumption of his duties at the P&DC.

Plaintiff also argues that Mr. Murphy's attempted investigative interview, ostensibly to determine the reason for Plaintiff's absences in June of 2004, was retaliatory.  The Court finds that a reasonable employee would not find the request for an investigative interview materially adverse.  Further, Plaintiff has failed to present sufficient evidence to rebut Mr. Murphy's stated reason for the investigative interview—to determine the reason for Plaintiff's absences.  Although Plaintiff called Attendance Control to report his absences, he was unable to get through and left a message with the plant manager's secretary instead.  Plaintiff has failed to present sufficient evidence to establish that the secretary completed the necessary documentation, or set

21

into motion those steps necessary to create such documentation, such that Mr. Murphy would have been aware of Plaintiff's call-in one day prior to their encounter. Therefore, based on the foregoing, Plaintiff has not presented sufficient evidence to show that the June 2004 investigative interview was retaliatory.

### c.  Manipulated Pay Entries During Front Street Detail

Plaintiff claims that Mr. Murphy retaliated against him by manually entering Plaintiff's pay entries, instead of ensuring that Plaintiff's pay was entered automatically. Although Plaintiff was anxious that his pay would be entered correctly, Plaintiff suffered no economic loss. The Court finds that a reasonable employee would not find Mr. Murphy's actions materially adverse. Plaintiff also argues that Mr. Murphy purposely made false statements during the EEOC investigation on this issue and that the Court should consider that evidence of motive. The Court finds that Mr. Murphy did not purposely falsify information relating to this issue during the EEOC investigation. While Defendants have not articulated a legitimate, nondiscriminatory reason for the manipulated pay entries, the burden of proof remains on Plaintiff to prove by a preponderance of the evidence that Defendants acted in retaliation. The Court finds that Plaintiff has not met his burden on this claim.

### d.  March 2005 Fitness for Duty Request

Plaintiff claims that Mr. Cuccia retaliated against him when he required Plaintiff to submit to a fitness for duty examination in March 2005. Defendants assert that they required Plaintiff to submit to a fitness for duty examination because Plaintiff told Mr. Williams that he could not climb ladders.

Plaintiff argues that he has shown that Defendant's explanation for the fitness for duty examination is not credible. First, Plaintiff asserts that because Mr. Cuccia received an email in

February 2004 stating that Plaintiff was working in the steels at the BMC, Mr. Cuccia could not have reasonably believed that Plaintiff had knee problems.  The Court, however, credits Mr. Cuccia's testimony that although he received the email, he would not have paid the email particular attention since he was at the P&DC at the time he received the email.  (Tr. 682-83.) Second, Plaintiff argues that he advised Mr. Cuccia that he could climb and work in the steels, and, yet, Mr. Cuccia nevertheless insisted on a fitness for duty examination.  The Court finds that it was reasonable for Mr. Cuccia, when faced with conflicting information on whether an employee was fit to work, to proceed with a request for a fitness for duty examination in order to protect the interests of the USPS as well as those of Plaintiff.  (See Tr. 691.)  Third, Plaintiff argues that according to USPS policy, Mr. Williams, as Plaintiff's direct supervisor, should have initiated the fitness for duty request and that this deviation from policy is evidence of pretext or motive.  The Court finds that James Kleber was Plaintiff's direct supervisor at the time Mr. Kleber requested the fitness for duty examination, albeit at Mr. Cuccia's suggestion, and thus was the proper official under USPS policy to request the examination.  Fourth, Plaintiff argues that the October 2004 letter that Mr. Cuccia sent Plaintiff exaggerates the amount of time that a supervisor's job duties called for time in the steels and that this purposeful exaggeration is evidence of motive.[11]  The Court finds that this discrepancy amounts to nothing more than impeachment on a collateral matter that does not fundamentally undermine Mr. Cuccia's credibility on the ultimate issue of whether the fitness for duty examination was retaliatory. Fifth, Plaintiff argues that his medical documentation was on file with Defendants and that the documentation did not indicate any limitations.  The Court credits Mr. Cuccia's testimony that he

---

[11] In pertinent part, Mr. Cuccia's letter to Plaintiff requesting medical documentation states, "Since approximately 75% of a Supervisor, Maintenance Operation's duties requires that you inspect your employee's work performances, which is mostly up in the steel via ladders, I can not see how you can perform your required core duties." (Ex. 54.) Plaintiff makes much of the fact that during Mr. Cuccia's deposition, he testified that 50% of Plaintiff's duties were office work and later changed his testimony during cross-examination at trial.  (Tr. 731.)

called the nurse's office to determine whether Plaintiff had a service-related disability on file but the office could not find the relevant information. (Tr. 690.) Sixth, Plaintiff asserts that Defendants did not call James Strange, who allegedly also heard Plaintiff tell Mr. Williams that he could not go up in the steels, because Mr. Strange would not have corroborated Mr. Williams' and Mr. Rhinehart's testimony. The Court can draw no such inference from the failure of either party to call Mr. Strange to testify. Finally, Plaintiff claims that Mr. Cuccia denied knowledge of Plaintiff's exercise of his FMLA rights on direct examination but acknowledged it on cross-examination. (See Tr. 712-716.) On direct, Mr. Cuccia testified that he was not aware of Plaintiff's FMLA requests in the fall of 2003, which testimony Plaintiff impeached when he presented Mr. Cuccia with a September 10, 2003 email from Willette Johnson, one of Defendants' FMLA coordinators, on cross-examination. (Id.) Mr. Cuccia also testified that the email was sent to numerous employees in maintenance at Plaintiff's pay location and that he was not Plaintiff's direct supervisor at the time. (Id.) The Court finds that Mr. Cuccia's lapse in memory does not discredit his testimony on the pertinent, material issue of whether Defendants' motive for the fitness for duty examination was retaliation.

The Court credits the testimony of Mr. Williams, Mr. Rhinehart, and Mr. Cuccia that Plaintiff claimed that he had a medical issue that prevented him from working in the steels, which prompted Plaintiff's supervisors to request a fitness for duty examination as a safety precaution. The Court finds that Plaintiff has not proven by a preponderance of the evidence that the fitness for duty request was motivated by retaliation.

### e. Debt Collection

Plaintiff further claims that Mr. Murphy and Mr. Cuccia engaged in retaliation by paying him for work not performed in August 2003 and then pursuing debt collection proceedings

against him.  As Plaintiff's first informal complaint of discrimination was filed on September 22, 2003 and Mr. Murphy erroneously allowed Plaintiff to be paid for August 24-28, 2003, the Court cannot find that Mr. Murphy retaliated against Plaintiff by setting in motion the events that would lead to debt collection based on Plaintiff's EEOC complaint.  August 24-28, however, is sufficiently close in time to Plaintiff's FMLA leave to be evidence of a causal connection between Plaintiff's FMLA rights and Mr. Murphy's actions.  Furthermore, Mr. Murphy had knowledge of Plaintiff's FMLA leave and a reasonable employee in Plaintiff's position would find setting into motion events that would lead to debt collection materially adverse.  While Defendants have not articulated a legitimate, nondiscriminatory reason for the extra pay entries, the burden of proof remains on Plaintiff to prove by a preponderance of the evidence that Defendants acted in retaliation.  The Court finds that Plaintiff has not met its burden with respect to the overpayment.

With respect to Mr. Cuccia's actions, the evidence leads to the opposite conclusion. Plaintiff argues that Mr. Cuccia's alleged continued debt collection efforts following the administrative law judge's order of October 11, 2005 was retaliatory.  At trial, Plaintiff testified credibly that Mr. Cuccia continued efforts to collect money from him on a daily basis well after the date of the administrative law judge's decision and that the judge eventually issued cease and desist orders in December 2005 and January 2006 directed towards Mr. Cuccia.  (Tr. 175-76.) Neither party submitted the cease and desist orders into evidence, however, the testimony of the parties sufficiently established these facts.  Defendants assert that Mr. Cuccia merely passed along information from the USPS Labor Department and did not engage in the type of actions to which Plaintiff testified.  Defendants' explanations ring hollow in the face of an order by the administrative law judge.  The Court finds that Defendants have failed to rebut Plaintiff's proof

on this issue.  The Court finds that Plaintiff has presented sufficient evidence to prove that Mr. Cuccia's actions were taken in retaliation for Plaintiff's engaging in protected activity. Accordingly, the Court finds for Plaintiff on this claim.

### f.   Detailing into Higher Jobs

Plaintiff additionally claims that he has not been permitted to detail into higher jobs since engaging in protected activities.  (Tr. 157-159.)  Plaintiff testified that "detailing" consists of being reassigned on a temporary basis to a job in a higher position, giving him experience that would increase his chance of promotion.  (Id.)

Plaintiff testified generally that he had a history of detailing into higher positions before he filed his first EEOC complaint.  (Tr. 159.)  Plaintiff provided no specific evidence of the number of times he had detailed in the past, the frequency with which an employee could reasonably expect to detail, or USPS policy or procedure for detailing.  Plaintiff also has not presented any evidence for job details that he requested but for which he was rejected.  Further, Plaintiff provided no evidence of a retaliatory motive on the part of Defendants or of specific actions taken by them to deny Plaintiff such opportunities.  Plaintiff also failed to present sufficient, specific evidence as to a causal connection.  The Court finds that Plaintiff has failed to present sufficient evidence for the Court to conclude by a preponderance of the evidence that Plaintiff's inability to obtain temporary detail opportunities was motivated by retaliatory intent.

### g.   Lowered Merit Pay Increases

Plaintiff also claims that, since he began engaging in his protected activities, the merit pay increases made or approved by Mr. Cuccia have been substantially lower than those of Plaintiff's peers.  Plaintiff testified that from 2004 to the present Defendants gave him substantially lower merit pay increases.  (Tr. 153.)  Mr. Cuccia was the official responsible for

concurring with the Manager of Maintenance Operations on his recommendation for each employee's performance rating in Plaintiff's field for 2006 through 2008.  (Tr. 706; Ex. 57-59.)

Plaintiff testified to specific monetary amounts lost as a result of reduced merit pay increases between 2004 and 2008.  (Tr. 153-154, 160-65.)  Without objection at trial, Plaintiff testified that he based his calculations on talking with other employees in the office about their merit increases.  (Tr. 154.)  Plaintiff asks the Court to award these damages.  Although in its proposed findings of fact and conclusions of law Defendants challenge Plaintiff's testimony on his merit pay increases as speculative, Defendants possessed the ability and resources to refute Plaintiff's calculations at trial but failed to do so.  Plaintiff, however, did not present sufficient evidence of the actual merit pay increases received by himself and other employees, which would be necessary for the Court to evaluate whether Plaintiff's merit pay increases were substantially lower than his peers as to evidence retaliation.

Defendants proffered a different type of evidence to show that Plaintiff's merit pay increases were not substantially lower than his peers—the end-of-the-year performance ratings for those employees at Plaintiff's level, supervisor of maintenance operations, for the years 2006, 2007, and 2008.  (Ex. 57-59.)  In 2006, each employee in Plaintiff's field, including Plaintiff, received the same overall performance rating of 7.  (Ex. 57.)  In 2007, three employees in Plaintiff's field received ratings of 8, two received ratings of 7, and four employees, including Plaintiff, received ratings of 6.  (Ex. 58.)  In 2008, each employee in Plaintiff's field, including Plaintiff, received ratings of 6.  (Ex. 59.)  Each performance rating corresponds to a specific range of merit pay increase.  (Tr. 663, 707, 794-95.)  Just because two employees received the same performance rating did not mean that the percentages of merit pay increase were the same for both employees.  (Tr. 794-95.)  The Court cannot conclude based on performance ratings that

do not necessarily correspond exactly with Plaintiff's merit pay increases that Plaintiff's merit pay was similar or dissimilar to that of his peers.  The Court, however, finds that Plaintiff has submitted insufficient evidence for the Court to conclude that Plaintiff's merit pay increases were substantially lower than those of his peers.

### 3.  Damages

#### a.  Non-Economic Damages

Plaintiff claims damages for emotional distress resulting from Defendants' retaliation in violation of Title VII.  Where an employer is found to have engaged in unlawful intentional discrimination prohibited under Title VII's anti-retaliation provision, a plaintiff may recover compensatory damages, including damages for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses."  42 U.S.C. § 1981a(a)(1) & (b)(3).  Compensatory damages do not include backpay or interest thereon.  Id. at (b)(2).  Before recovering compensatory damages for emotional distress, a plaintiff must prove that the defendant's unlawful actions caused his or her emotional distress. See Turic v. Holland, Inc., 85 F.3d 1211, 1215 (6th Cir. 1996) (citing Carey v. Piphus, 435 U.S. 247, 263-64 (1978)).  Such proof customarily is demonstrated by "showing the nature and circumstances of the wrong and its effect on the plaintiff."  Carey, 435 U.S. 263-64.  "A plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden in this regard."  Id.  The compensatory damages awarded must be proportional to the injury and must be assessed by taking into account the totality of the circumstances.  See Moore v. Kuka Welding Sys., 171 F.3d 1073, 1082 (6th Cir. 1999).  Plaintiff argues that, based on his testimony and the deposition testimony of Plaintiff's treating

28

psychiatrist, Dr. Valerie Augustus, the Court should award the maximum amount of compensatory damages—$300,000.

Plaintiff testified that he suffered from migraine headaches and irritable bowel syndrome as a result of the stress he experienced from all of Defendants' alleged retaliatory acts. (Tr. 168-69.) Plaintiff also testified that he sought psychiatric treatment first from Dr. Jean Pierre and then from Dr. Valerie Augustus, who treated him for depression and night terrors. (Tr. 171-72.) Dr. Augustus testified that she was Plaintiff's treating physician for approximately two years from July 25, 2006 until April 10, 2008. (Depo. of Dr. Valerie Augustus ("Augustus Depo.") 12 and 17.) Dr. Augustus' initial appointment with Plaintiff lasted approximately forty-five minutes to one hour, and she saw Plaintiff every three months for fifteen minutes thereafter to evaluate whether Plaintiff was still having symptoms despite the medication and to otherwise manage Plaintiff's medication. (Augustus Depo. 27, 38-39; Ex. 1 to Augustus Depo.; Tr. 172.) Based on the records of Plaintiff's previous psychiatrist, Dr. Jean Pierre,[12] who has since retired, as well as the history Plaintiff presented to Dr. Augustus, she concluded that Plaintiff suffered from an adjustment disorder, the continuing symptoms of which were a result of ongoing stress at Plaintiff's job. (Augustus Depo. 20 -23; Tr. 172.) Dr. Augustus continued Dr. Pierre's treatment of Plaintiff for anxiety, depression, and sleep issues. (Augustus Depo. 14-16.)

As the Court has found merit in one of Plaintiff's Title VII retaliation claims, any emotional distress attributable to Plaintiff's belief that he was retaliated against in other ways ordinarily cannot be a basis for a remedy. See e.g., Merriweather v. Family Dollar Stores, 103 F.3d 576, 581 (7th Cir. 1996). However, the Court notes that emotional distress brought on by discrimination and retaliation cannot be neatly compartmentalized. The Court credits the

---

[12] Dr. Pierre's patient record for Plaintiff indicates that Plaintiff was Dr. Pierre's patient beginning at least in December of 2003 until late March of 2006. (Ex. 1 to Augustus Depo.)

testimony of Plaintiff and Dr. Augustus and finds that Plaintiff suffered emotional distress manifested by depression, night terrors, and anxiety as a result, at least in part, of Defendants' retaliation from a range of actions.  Plaintiff has sufficiently demonstrated that Mr. Cuccia's actions during October 2005 to January 2005, in repeatedly asking Plaintiff to pay money that he did not owe on a daily basis, caused Plaintiff emotional harm.  The Court finds that Plaintiff has sufficiently shown that he experienced emotional distress as a result of Mr. Cuccia's retaliatory actions.  The Court therefore awards Plaintiff compensatory damages.

It must be noted that Plaintiff did not present specific damage calculations for emotional distress.  However, there is no mathematical formula for computing reasonable compensation for physical pain and suffering, emotional pain, or the loss of enjoyment of life.  The fact finder must employ reasonable judgment in making the award.  Based on the length and severity of the retaliatory acts in this case, the Court awards Plaintiff a sum of $75,000 as to the retaliation claim.

### b.  Other Damages

Plaintiff also requests damages for the amount of leave time he used from 2004 to 2008 as a result of Defendants' retaliation under Title VII.  (Tr. 168.)  For example, Plaintiff testified that he lost $20,676.92 in 2005 and $18,144 in 2006 in time that he would not have otherwise taken off from work but for Defendants' retaliatory acts.  Plaintiff further testified that he continues to miss work due to the continuing effects of the alleged retaliatory acts that occurred in 2003-2005.  Assuming that Plaintiff can recover this type of damages, Plaintiff failed to demonstrate at trial that his damages flowed from the specific actions of Mr. Cuccia in October 2005 to January 2005.  Plaintiff only testified to an amount of damages lost on a yearly basis as a result of all of Defendants' alleged retaliatory actions.  The Court cannot speculate as to what

Plaintiff's damages might have been and thus denies Plaintiff's request for damages for leave time used in October 2005 to January 2005.

### C. Attorney's Fees

Plaintiff also seeks an award of attorney's fees and costs under the FMLA and Title VII. Under the FMLA, in addition to any judgment awarded to a plaintiff, the Court shall award reasonable attorney's fees and costs. See 29 U.S.C. § 2617 (a)(4). Thus, the FMLA mandates an award of attorney's fees when a violation of the Act is established and a judgment is awarded to a plaintiff. See Bond v. Abbott Labs., No. 98-3923, 1999 U.S. App. LEXIS 22242, at *11-12 (6th Cir. Sept. 9, 1999). Therefore, Plaintiff is entitled to reasonable attorney's fees under the FMLA.

Under Title VII, a court has the discretion to award reasonable attorney's fees to the prevailing party in a Title VII action, and "the United States shall be liable for costs the same as a private person." 42 U.S.C. § 2000e-5(k) (2000). "Plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefits the parties sought in bringing the action." Hensley v. Eckerhart, 461 U.S. 424, 431 (1983) (quoting Nadeau v. Helgemoe, 581 F.2d 275, 278-79 (1st Cir. 1978)) (stating "[t]he standards set forth in this opinion are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party'"); See Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 789 (1989). "The touchstone of the prevailing party inquiry [therefore] must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." Hood v. Keller, 229 F. App'x 393, 401 n.8 (6th Cir. 2007) (quoting Tex. State Teachers Ass'n, 489 U.S. at 792-93). A party may be benefitted by receiving "monetary damages, injunctive relief, . . . a voluntary change in a

defendant's conduct," or a declaratory judgment.    Owner-Operator Indep. Drivers Ass'n v. Bissell, 210 F.3d 595, 597-98 (6th Cir. 2000) (quoting Wooldridge v. Marlene Indus., 898 F.2d 1169, 1173 (6th Cir. 1990)).

In this case, Plaintiff brought several causes of action under Title VII—racial discrimination, disability discrimination, and retaliation.  Plaintiff did not prove any racial or disability discrimination.  Plaintiff succeeded only in proving one of over ten allegations of retaliation.  Although Plaintiff has succeeded on only a small portion of his claim, Plaintiff is entitled to monetary relief, which materially alters the legal relationship between the parties. See, e.g., Harmond v. Cavazos, No. 1:89-cv-2030-ODE, 1991 U.S. Dist. LEXIS 20331, at *8-10 (N.D. Ga. April 29, 1991) (finding that a plaintiff who failed to prove discrimination but established retaliation as to one of five performance evaluations was a prevailing party).  As such, Plaintiff is a prevailing party under Title VII's fee-shifting statute and is entitled to attorney's fees.

Plaintiff shall submit within fifteen (15) days of this order a motion for attorney's fees supported by proper documentation.  Defendants shall have fifteen (15) days following the filing of Plaintiff's motion to respond.  The Court will then determine the amount of fees to be awarded.

## III.  CONCLUSION

Based on the forgoing reasons, the Court enters judgment for Plaintiff Marcus Seymour on his FMLA interference and retaliation claims and for Plaintiff on one of his retaliation claims. Post judgment interest is mandatory and will be calculated at a rate pursuant to 28 U.S.C. § 1961. All other claims of Plaintiff's Amended Complaint are dismissed.  The Court will award attorney's fees by separate order.  Judgment shall be entered accordingly.

**IT IS SO ORDERED**, this 25th day of March, 2010.

s/Bernice Bouie Donald
**BERNICE BOUIE DONALD**
**UNITED STATES DISTRICT JUDGE**